On September 13, 1997, James Williams was found dead inside the waste-breading trailer on the premises of his employer, Cagles, Inc. ("Cagles"). The official cause of death was asphyxiation caused by exposure to an extreme concentration of carbon dioxide ("CO2") gas. Sandra Warren, Williams's common-law wife, sued Cagles,[1]
Griffin Industries, Inc. ("Griffin"), BOC Group, Inc. ("BOC"), and four coemployees: Terry Wester, the plant safety coordinator; Wade Hankinson, the plant manager; Ken Nix, the corporate safety coordinator; and Ronnie Adrian, the first shift production manager. The coemployees moved for a summary judgment, attaching, among other things, portions of the testimony of the coemployees and others in a related trial[2]. The trial court entered a summary judgment in favor of the coemployees. Warren appealed, and this court dismissed the appeal because it appeared that the claims against the remaining corporate defendants remained pending below and the trial court had not made the summary judgment final pursuant to Rule 54(b), Ala.R.Civ.P.Warren v. Wester, 796 So.2d 377 (Ala.Civ.App. 2001). The trial court has since dismissed the claims against the corporate defendants, and Warren again appealed the summary judgment for the coemployees to the Alabama Supreme Court, which transferred the case to this court, pursuant to Ala. Code 1975, § 12-2-7(6).
We review a summary judgment de novo; we apply the same standard the trial court applied. A party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c), Ala.R.Civ.P.; see Lee v. City ofGadsden, 592 So.2d 1036, 1038 (Ala. 1992). If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by `substantial evidence.'" Lee, 592 So.2d at 1038. *Page 118 
"Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders LifeAssurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989); see Ala. Code 1975, § 12-21-12(d). See Exparte General Motors Corp., 769 So.2d 903 (Ala. 1999);West, 547 So.2d at 871; and Bass v. SouthTrust Bank ofBaldwin County, 538 So.2d 794 (Ala. 1989), for further discussion of the application of the summary-judgment standard.
Cagles operates a chicken processing plant, which produces, among other things, frozen breaded chicken pieces. The chicken pieces are first coated with breading. Some of the breading becomes dislodged after the breading procedure. The chicken is then processed through a "flighted freezer" on conveyor belts. In the freezer, the chicken is sprayed with liquid CO2 to quick-freeze it; this process dislodges more of the breading. The dislodged breading, called "waste breading," is placed in bins and is then taken to a trailer for collection and storage until another company, Griffin, retrieves the trailer and hauls off the waste breading for use in making chicken feed.
The waste-breading trailer was originally accessed through the rear door. Between 1991 and 1995, the waste breading was collected in boxes, which were stacked on a pallet. The pallet was loaded into the rear of the trailer. The employees responsible for dumping the waste breading would take the boxes to the front of the trailer, empty them, and repeat the process until all the boxes had been emptied. In 1995, the procedure for loading the trailer was changed. The trailer was parked beside an earthen berm, forklifts were fitted with a rotating device to which plastic bins were attached, and the forklifts emptied the bins into openings cut into the top of the trailer. The rear door of the trailer was kept closed. Once the new method was implemented, Cagles employees were no longer required to enter the trailer.
Williams, however, complained to his supervisor, Marlon Knott, about having to climb onto the top of the trailer to manually empty smaller containers of waste breading into the openings. Knott instructed Williams not to climb on the top of the trailer, but instead to dump any smaller containers of waste breading into a plastic bin for dumping by the forklift. The trial testimony and the affidavits of truck drivers for Griffin revealed that Cagles employees, including Williams, often climbed on top of the trailer, in some cases to empty boxes of waste breading, sometimes to shovel waste breading that had not entered the openings, and sometimes to assist the truck drivers in preparing the trailer for hauling.
Approximately 30% of the waste breading loaded into the trailer is saturated with liquid CO2 The remaining 70% is breading that fell off the chicken before it entered the freezer; that breading has not been saturated with liquid CO2. As the saturated breading falls off in the freezer, in which the temperature is -180x, it becomes extremely cold. The liquid CO2 becomes a solid form of CO2, what the parties refer to as "snow." As the waste breading warms in the trailer, the CO2 snow sublimates into gas form. CO2, in gaseous form, is heavier than oxygen. As the CO2 sublimates, it forms a "blanket" along the bottom of the trailer, forcing the lighter oxygen upward, out of the openings in the top of the trailer.
CO2, although present in small amounts in the air, will essentially suffocate a person exposed to a concentrated amount. When Williams either fell into or climbed *Page 119 
into the trailer on September 17, 1997, he entered an atmosphere containing a high concentration of CO2. Because the rear doors to the trailer could not be opened from the inside, Williams could not have exited the trailer without assistance. In fact, although the trailer was not tested to determine the concentration of CO2 present on the day of the accident, Williams very likely would not have been able to save himself even if the rear doors could have been opened from the inside because the high concentration of CO2 would have killed him before he could have reached the doors.
As a result of the investigation of the accident, the Occupational Safety and Health Administration ("OSHA") cited Cagles for various infractions. The most serious of these citations were for Cagles's failure to guard the openings in the roof of the trailer, its failure to treat the trailer as a permit-required confined space,[3]
and its failure to label the trailer as containing a hazardous chemical. Some of the citations were for repeat offenses, and several of them were for infractions not related to the trailer or the accident. Warren sued Williams's coemployees, Wester, Hankinson, Nix, and Adrian, alleging that their willful conduct under § 25-5-11(c)(1) and (c)(2), resulted in Williams's death. On appeal, she argues only that the coemployees' conduct amounted to willful conduct under § 25-5-11(c)(1). That section reads as follows:
 "(c) As used herein, `willful conduct' means any of the following:
 "(1) A purpose, intent, or design to injure another; and if a person, with knowledge of the danger or peril to another, consciously pursues a course of conduct with a design, intent, and purpose of inflicting injury, then he or she is guilty of `willful conduct.'"
After considering the evidence presented and the law interpreting § 25-5-11(c)(1), we conclude that the summary judgment in favor of the coemployees was proper.
The Alabama Supreme Court has interpreted § 25-5-11(c)(1) as requiring evidence that the coemployee either intended to injure someone or that he was substantially certain that injury or death would result from his action or inaction, stating:
 "[T]he Legislature expressed concern over the rising costs of litigation among co-employees, as well as the disruptive effect that such litigation can have on workers. That concern indicates to us that the Legislature intended for an injured plaintiff to prove more than simply that he was compelled to work under circumstances that posed a foreseeable risk of harm to him or others (or circumstances from which harm could likely or even probably result), in order to maintain his action based on the `wilfulness' of a co-employee defendant. To the contrary, we believe that the Legislature sought to insure that these kind of cases would not be submitted to a jury without at least some evidence tending to show either 1) the reason why the co-employee defendant would want to intentionally injure the plaintiff, or someone else, or 2) that a reasonable person in the position of the defendant would have known that a particular result *Page 120 
 (i.e., injury or death) was substantially certain to follow from his actions. (A purpose, intent, design to injure was not intended to be reasonably inferred from evidence showing only knowledge and appreciation of a risk of injury or death short of substantial certainty that injury or death would occur.)"
Reed v. Brunson, 527 So.2d 102, 120 (Ala. 1988) (first and last emphasis added).
More recently, in Ex parte Martin, 733 So.2d 392, 395 (Ala. 1999), our supreme court discussed again the heavy burden imposed upon the plaintiff in coemployee actions under § 25-5-11(c)(1). According to the court, "the plaintiff must, of course, show that the coemployee defendant was substantially certain that, if the accident occurred, injury or death would result." Ex parte Martin, 733 So.2d at 396. In addition, the court pointed out that "the plaintiff must also show that the coemployee defendant was substantially certain that the accident would follow from his actions." Id. (emphasis added). This is the very proof that is missing in this case.
Wester, the plant safety supervisor since May 1995, testified that he had never seen an employee on top of the trailer. He explained that he had been concerned about CO2 levels inside the plant, but that he had never considered that dangerous levels of CO2 might accumulate in the trailer. He stated that he had never inspected the trailer and that he did not know if it was ventilated. Wester further testified that he was never given any safety training to prepare him to be safety director and that he relied on common sense in performing that job. Wester has only a ninth-grade education. He testified that he had placed all the material safety data sheets (MSDS) in a three-ring binder in the employee break room for easy access by the employees, but that he had never supplied an MSDS to each individual employee.
Adrian, who had been the plant manager from 1991 to February 1996, was shift manager for first shift production at the time of the accident. He testified that the freezer had operated inefficiently since its installation in 1991. He explained that Cagles would contact BOC, the company that sold Cagles the freezer and supplied it CO2, when the CO2
levels in the plant would rise. BOC would assist in recalibrating the freezer and offer other suggestions such as changes in the venting system to help eliminate the CO2 problems the freezer caused. Adrian admitted that he knew that closing the doors of the trailer would create a hazardous atmosphere inside the trailer; however, he testified that he did not know that employees had to get on top of the trailer for any reason and he did not believe that an employee should have been in the trailer for any reason.
Hankinson, the plant manager at the time of the accident, admitted that he was aware that a concentration of CO2 in a confined area could kill a person. He knew the freezer had been operating inefficiently and that it had been using too much CO2. According to Hankinson, when he first took over as plant manager in 1996, he saw an employee on top of the trailer. He stated that he spoke with several subordinates about what he had seen and that they assured him that an employee should not be on top of the trailer. He never saw another employee on top of the trailer. He testified that he did not consider the trailer hazardous and explained that his concerns about CO2 involved in-plant concentrations because if the concentrations were too high, the plant would have to shut down to exhaust the area, causing a shortage in production. *Page 121 
Nix, the corporate safety coordinator whose office was located in Atlanta, Georgia, testified that he was not aware of what the plant did with its waste breading. He stated that he thought it might have been given to local farmers or hauled off by a feed company. Although he had been on walk-though inspections at the plant on occasion, he did not know that the trailer was used to collect waste breading.
Letters written by employees of BOC were admitted as evidence. These letters indicated that CO2 levels at the plant were increased by the inefficient operation of the freezer. One particular letter written in 1993 stated that the waste breading mixed with CO2 snow was "very difficult to deal with in such large volumes." This letter, according to Warren, indicates that the coemployees knew that the saturated waste breading was causing CO2 levels to rise within the plant and that they should also have known that the saturated waste breading posed a hazard because it was being collected in a confined area. However, the coemployees' awareness of increased CO2 levels inside the plant do not support the proposition that they were aware that the trailer also contained high concentrations of CO2. At the time the 1993 letter from BOC was written the old method of loading waste breading into the trailer was being used, and the open doors of the trailer provided ventilation. The change in the loading procedure ended the exposure of Cagles employees to CO2 inside the trailer.
Warren's evidence indicates that the procedure of loading waste breading into the trailer exposed employees to a potential danger. The testimony of the coemployees indicates that all of them knew that CO2
could be dangerous and even deadly in certain circumstances; however, none of them was substantially certain that injury or death would occur as a result of the top-loading procedure, because none of them knew that a Cagles employee would get on the top of the trailer, where there was a danger that the employee would fall into the trailer. In fact, it appears that the only person to ever see a Cagles employee on the trailer, Hankinson, was assured that an employee should not be on the trailer; he never saw another employee on the trailer.
Warren argues that the OSHA citations indicate that the coemployees should have known that, to a substantial certainty, injury or death would result from the top-loading procedure. The citation concerning the failure to guard the openings on the trailer was not a repeat citation, so the coemployees could not have had any advance notice of the likelihood of injury before the issuance of that citation. See Ex parteMartin, 733 So.2d 392, 396 (Ala. 1999). Although some of the citations arising from the OSHA inspection after this incident were for repeat offenses, the repeat offense that appears pertinent to this case was the failure to mark a container of hazardous chemicals so as to identify the chemical. The prior citation for such an offense is not in the record, and we are unable to determine whether the "repeat" aspect of the citation pertains only to the type of citation or to the particular location of the offending container. In any event, our supreme court has not yet held that OSHA citations are evidence that compels the conclusion that a coemployee was substantially certain that injury or death would occur. In fact, in two cases involving OSHA citations, the court has held that such citations would not support that finding. See Ex parte Martin, 733 So.2d at 396 (holding post-accident citation not sufficient to support finding that coemployee was substantially certain that injury or death would occur), and Harris v. Simmons, 585 So.2d 906, 908 (Ala. 1991) (holding that pre-accident citation would not *Page 122 
support a finding that coemployees were substantially certain that injury or death would occur).
We therefore conclude that Warren's evidence does not rise to the level necessary to overcome the coemployees' motion for a summary judgment. It simply is not substantial evidence creating a genuine issue as to whether the coemployees were substantially certain that injury or death would result from continued use of the top-loading procedure; that is, it is not substantial evidence that the coemployees themselves were substantially certain that the accident that did occur at Cagles on September 13, 1997, would happen. See Bean v. Craig, 557 So.2d 1249, 1252
(Ala. 1990); Ex parte Martin, 733 So.2d at 396. At most, Warren's evidence indicates that the coemployees were aware of the potential hazards of working with CO2 and that they were aware that CO2 posed a risk of injury or death in certain circumstances. "`Evidence showing only knowledge and an appreciation of the risk of injury or death, short of a substantial certainty that injury or death would occur, is insufficient for the purpose of showing willful conduct under [§ 25-5-11(c)(1)].'"Ex parte Martin, 733 So.2d at 395 (quoting Layne v. Carr, 631 So.2d 978,982 (Ala. 1994)). The summary judgment in favor of the coemployees is affirmed.
AFFIRMED.
Thompson and Pittman, JJ., concur.
Yates, P.J., and Murdock, J., concur in the result.
[1] Cagles and Warren have entered into a settlement, and Cagles is not a party to this appeal.
[2] On the same day Williams was found dead in the waste-breading trailer, Jeremy Higginbotham was also found dead in the trailer. His wife, Kristi Higginbotham, sued Cagles, Griffin, BOC, and the four coemployees. That case proceeded to trial, at which the jury returned a verdict in favor of two of the coemployees. The record does not reflect the outcome of Higginbotham's suit against the two other coemployees.
[3] Warren makes much of the OSHA citation regarding Cagles's failure to treat the trailer as a permit-required confined space. However, as the coemployees point out, that citation was vacated by the administrative law judge. We can take judicial notice of the quasijudicial fact of the vacation of the citation, although we are generally not permitted to take judicial notice of the records of another judicial body. See Worthingtonv. Amerson, 741 So.2d 437, 438 n. 2 (Ala.Civ.App. 1999) (explaining that this court could take judicial notice of the fact of the dismissal of a federal action).