J.B. ("the mother") and S.M. ("the father") appeal from a judgment of the trial court refusing their request for the return of custody of their daughter (hereinafter "the child"). We affirm.
On September 28, 2006, the mother took the child, who was one month old at the time, for a routine checkup. During that checkup, the doctor treating the child observed trauma to the child's head. X-rays of the child's head taken that same day revealed skull fractures on the left posterior side of the child's head. The child was immediately transferred to Children's Hospital in Birmingham for further treatment.
On October 2, 2006, the Cleburne County Department of Human Resources ("DHR") filed a petition alleging that the child was a dependent child pursuant to § 12-15-1(10), Ala. Code 1975, and seeking immediate, temporary custody of the child. The trial court entered an order on October 2, 2006, awarding DHR temporary custody of the child. On October 3, 2006, the mother and the father answered DHR's petition and requested that the trial *Page 36 
court conduct a shelter-care hearing. Following the shelter-care hearing, the trial court entered an order on October 5, 2006, in which it found that placement of the child in the home of the mother and the father was not in the best interest of the child and transferred custody of the child to DHR. Following a November 7, 2006, dependency hearing, the trial court entered an order finding the child to be dependent and transferring custody of the child to DHR. On March 7, 2007, following a review hearing, the trial court entered an order continuing custody of the child with DHR. In the trial court's October 5, 2006; November 7, 2006; and March 7, 2007, orders, the trial court ordered DHR to continue to make reasonable efforts to reunify the child with the mother and the father.
On March 27, 2007, the mother and the father filed a petition for return of custody of the child. Following an ore tenus hearing on July 10, 2007, the trial court entered an order on August 8, 2007, denying the mother and the father's petition to regain custody of the child and reiterating its finding of dependency. In its August 8, 2007, order, the trial court stated that it was relieving DHR of the requirement that it continue its reunification efforts. The mother and the father timely appealed.
The evidence in the record on appeal reveals the following pertinent facts. At the time of the July 10, 2007, hearing, the child was 10 months old and had been in DHR's custody for 9 months. The child tested positive for methadone at the time of her birth. The mother, who was 37 years old at the time of the June 10, 2007, hearing, has an extensive history of drug and alcohol abuse. The mother began using drugs and alcohol around the age of 16. Over the course of her 20-year addiction to drugs, the mother abused crack cocaine, heroin, and prescription pain medications. At the time the child was placed in DHR's custody, the mother was abusing methadone.[1] The father does not have a history of drug or alcohol abuse.
The record indicates that the father has a criminal record. While going through a divorce with his former wife, the father's former wife accused him of rape and domestic violence. The father was subsequently charged with those crimes. On May 13, 2004, the father pleaded guilty to domestic violence. The father also pleaded guilty to assault in the third degree. The record does not reveal the terms of the sentences imposed on the father following his pleas; however, the father completed a 16-week domestic-violence course in late 2004.
In October 2006, after the trial court had removed the child from the mother and the father's custody, DHR developed an individualized service plan ("ISP") for the parties to follow in order to regain custody of the child. The ISP required both the mother and the father to participate in a psychological evaluation; to participate in counseling for past drug abuse and domestic violence; to participate in random drug screens and to remain drug-free and alcohol-free; to exercise supervised visitation with the child; and to provide an explanation for the fractures to the child's skull.
Lisa Patton, a DHR caseworker, testified that the mother and the father had accomplished most of the goals set for them in the ISP and that they had cooperated with DHR. Patton testified that the *Page 37 
mother and the father had completed psychological evaluations and had participated in counseling. According to Patton, the mother and the father had remained drug-free and alcohol-free as requested by DHR. Patton testified that she was satisfied with the mother's progress and participation in a drug- and alcohol-rehabilitation program.
Patton expressed concern regarding the father's attitude during a couple of visits the father and the mother made to Patton's office. Patton testified that on one occasion the father "almost crossed the line of a threat" when he stated that "if he doesn't get his baby back somebody will pay." Patton stated that she believed that the father was referring to taking legal action. Patton testified that a similar incident occurred the week before the final hearing when the mother and the father received letters notifying them that child abuse and/or neglect had been "indicated" following an investigation. According to Patton, the mother tried to nudge the father out of the building when the father became upset and said: "`Don't put your hands on me, I won't put my hands on you.'" Patton testified that the father's comment caused her concern.
Patton testified that the only provision in the ISP that the mother and the father had failed to comply with was offering a plausible explanation for the child's skull fractures. While testifying at the July 10, 2007, hearing, Patton alluded to explanations given by the parents at the November 7, 2006, dependency hearing. On direct examination, Patton testified as follows:
 "Q. Have the parents provided explanations for the child's injuries?
 "A. They have provided explanations.
 "Q. And we went through all of those in the dependency hearing?
 "A. Correct.
 "Q. Have there been any other explanations provided?
 "A. Not to my knowledge no, just the same ones."
On cross-examination, Patton further testified:
 "Q. You don't have any direct evidence, but you were present at the prior [dependency] hearing and you heard the testimony there and the parents' explanation.
 "A. Correct.
 "Q. And you are familiar with Dr. Amyia, the doctor at Children's Hospital, her statement?
 "A. Correct.
 "Q. You don't have any evidence that otherwise explains the unexplained?
 "A. Correct."
The record indicates that Dr. Michelle Amyia[2] diagnosed the child's skull fractures. It appears from the record that Dr. Amyia's deposition testimony was admitted into evidence at the November 7, 2006, dependency hearing. Patton testified that she did not perform the investigation of the child's head injury. According to Patton, Jennifer Rios, another DHR employee, had investigated the injury and had testified regarding her investigation of the injury at the earlier dependency hearing. The record does not contain a copy of a transcript of the dependency hearing or any documentary evidence offered at that hearing.
According to Patton, if it were not for the unexplained injury to the child, DHR would return the child to the mother and the father's custody. Patton testified that DHR's policy provides that a child cannot *Page 38 
be returned to a home if a serious, unexplained injury occurred in the home. Patton testified that DHR is investigating a relative placement for the child pending a plausible explanation from the mother and the father for the child's head injury.
The mother testified that she had met all the goals required by DHR in the ISP. The mother stated that she had been drug-free since December 4, 2006, and that she planned to complete the rehabilitation program offered by Helping Partners, LLC. The mother testified that she had offered DHR an explanation for the child's skull fractures as required in the ISP. The mother explained that the skull fractures could have been the result of actions taken by a babysitter who had babysat the child on four occasions before the child was diagnosed with the skull fractures. The mother denied any knowledge of the child's falling or sustaining injuries in her or the father's presence. The mother denied that the father had committed acts of domestic violence against her.
The father testified that he and the mother were common-law married and had been living together since 2003. The father testified that he had never committed acts of domestic violence against the mother. The father denied doing anything to hurt the child. The father testified that he believed that the fractures to the child's skull were the result of trauma during birth.
Several witnesses testified at the July 10, 2007, hearing regarding the mother's history of drug and alcohol abuse and her treatment for substance abuse. James Hayes, the owner of Helping Partners, testified that his company offers an 18-month rehabilitation program for drug and alcohol addiction. Hayes testified that the mother began "phase one" of the program, also called "early recovery," on December 19, 2006. According to Hayes, the mother had successfully completed phase one and, at the time of the July 10, 2007, hearing, was participating in "phase two," known as "relapse prevention." Hayes testified that he believed that the mother understood that addiction is a "chronic brain disease." On cross-examination, Hayes acknowledged that he was not a licensed professional counselor or a mental-health professional.
Beth Storey, an educator employed by Helping Partners and the mother's sponsor in that program, testified that the mother had performed well in the program and had faithfully attended meetings. Storey testified that a high risk of relapse exists for two years after an addict stops using drugs. According to Storey, the mother believed that the child sustained the skull fractures during birth.
Carrie Halladay, a licensed professional counselor, provided services to the mother and the father at the request of DHR. Halladay testified that she had performed a domestic-violence assessment on the parents and that both parents had denied that there was any domestic violence in their relationship. Halladay testified that she did not independently investigate any other possible incidents of domestic violence that the father might have been involved in and that she had relied solely on the father's self-reporting his history of domestic violence.
Halladay testified that she had no concerns about the mother's ability to parent the child. According to Halladay, since October 2006 the mother had consistently met with her once a week for counseling. Halladay testified that she conducted the counseling sessions with the mother in the mother's home. Halladay testified that the mother's home appeared to be appropriate for a small child, but Halladay testified that she had not observed the mother with the child in the home. Halladay explained *Page 39 
that the mother had made significant progress in counseling. Halladay testified that she had recommended individual counseling for the father, but the father was unable to attend counseling sessions because of his work schedule.
On cross-examination, when asked if there was a reasonable possibility that the mother could relapse, Halladay answered yes. However, Halladay testified that the likelihood that an addict could relapse decreases when the addict attends support meetings, stays in a rehabilitation program, and maintains contact with a sponsor; all of which, according to Halladay, the mother was doing at the time of the hearing. Halladay testified that, generally, it was possible that the mother could not remember actions she had taken while under the influence of drugs.
Martha Jane Hollis, who had supervised the mother and the father's visitation with the child, testified that the mother and the father responded appropriately to the child during visitation. According to Hollis, the child had bonded with the mother and the father. Hollis stated that she had not observed any indication of domestic violence between the mother and the father during visitation.
Debra Braswell, who supervised visitation between the mother, the father, and the child at the time of the July 10, 2007, hearing, testified that she had no concerns about the mother and the father's ability to parent the child. According to Braswell, the mother and the father were "very good" at handling and caring for the child during visitation. Braswell testified that she had never witnessed any indication of domestic violence between the mother and the father.
The mother and the father contend on appeal that the trial court erred when it denied their petition to return custody of the child because, they argue, they complied with the reunification plan as instructed by DHR. The mother and the father essentially challenge the trial court's determination that the child continued to be dependent.
This court is limited in its review of a trial court's judgment when a trial court receives ore tenus evidence. A trial court's judgment resolving disputed ore tenus evidence is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that the factual findings upon which the judgment is based are so unsupported by the evidence as to be plainly and palpably wrong. T.D.P. v. D.D.P., 950 So.2d 311
(Ala.Civ.App. 2006). This "`presumption of correctness is based in part on the trial court's unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor.'" L.L.M. v. S.F., 919 So.2d 307, 311
(Ala.Civ.App. 2005) (quoting Littleton v. Littleton,741 So.2d 1083, 1085 (Ala.Civ.App. 1999)). The determination of the credibility and veracity of the witnesses is the responsibility of the trial court. Earheart v. Earheart,842 So.2d 695 (Ala.Civ.App. 2002).
We are not allowed to substitute our judgment for that of the trial court, even when this court might have reached a different result, unless the trial court's resolution of the facts is plainly and palpably wrong. L.R.M. v. D.M.,962 So.2d 864, 873-74 (Ala.Civ.App. 2007) (citing Griggs v.Griggs, 638 So.2d 916, 918-19 (Ala.Civ.App. 1994), quoting in turn Young v. Young, 376 So.2d 737, 739
(Ala.Civ.App. 1979)). "`[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.'" Exparte R.E.C., 899 So.2d 272, 279 (Ala. 2004) (quoting Exparte Foley, *Page 40 864 So.2d 1094, 1099 (Ala. 2003)). When addressing the inability of an appellate court to reweigh the evidence and substitute its judgment for that of the trial court, our supreme court recognized:
 "The trial court must be allowed to be the trial court; otherwise, we (appellate court judges and justices) risk going beyond the familiar surroundings of our appellate jurisdiction and into an area with which we are unfamiliar and for which we are ill-suited — factfinding."
Ex parte R.T.S., 771 So.2d 475, 477 (Ala. 2000).
A finding of dependency must be supported by clear and convincing evidence. § 12-15-65(f), Ala. Code 1975;J.S.M. v. P.J., 902 So.2d 89, 95 (Ala.Civ.App. 2004). This court has stated that clear and convincing evidence is
 "`"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
"`§ 6-11-20[(b)](4), Ala. Code 1975.'"
J.C. v. State Dep't of Human Res., 986 So.2d 1172,1184 (Ala.Civ.App. 2007) (quoting L.M. v. D.D.F.,840 So.2d 171, 179 (Ala.Civ.App. 2002)). Matters of dependency are within the sound discretion of the trial court, and a trial court's ruling in a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong. T.D.P. v.D.D.P., supra. The transfer of custody upon a finding of dependency is governed by the child's best interests.F.G.W. v. S.W., 911 So.2d 1, 4 (Ala.Civ.App. 2004) (citing Jones v. Webb, 524 So.2d 374, 374
(Ala.Civ.App. 1988)).
At the outset, we note that the mother and the father refer to evidence in support of their argument on appeal that is not contained in the record. Included in that evidence is an 8x10 photograph taken of the child immediately after she was born. The record indicates that before the trial court conducted the July 10, 2007, hearing, the parties stipulated that the testimony and documentary evidence from the November 7, 2006, dependency hearing be "incorporated" with the evidence presented at the July 10, 2007, hearing so that the trial court could consider all the evidence before rendering its judgment. The trial court agreed to the stipulation and noted that it would "review the notes and also the transcript on the prior adjudication of dependency." The record on appeal does not contain a copy of the transcript of the dependency hearing or any documentary evidence admitted at that hearing.
It is well settled that "an appellate court is limited to a review of the record, and the record cannot be changed, altered, or varied on appeal by statements in briefs of counsel."Quick v. Burton, 960 So.2d 678, 680-81
(Ala.Civ.App. 2006) (citing Wal-Mart Stores, Inc. v.Goodman, 789 So.2d 166, 176 (Ala. 2000), and Gotlieb v.Collat, 567 So.2d 1302, 1304 (Ala. 1990)). This court cannot presume error or the existence of facts to which the record is silent. Id. Also, this court must conclusively presume that the evidence not contained in the record on appeal supports the trial court's judgment. Sartin v. Sartin,678 So.2d 1181, 1183 (Ala.Civ.App. 1996).
The burden is on the mother and the father, as the appellants, to ensure that the record on appeal contains sufficient evidence to warrant a reversal. Goree *Page 41 v. Shirley, 765 So.2d 661, 662 (Ala.Civ.App. 2000). The mother and the father have not attempted to invoke Rule 10(f), Ala. R.App. P., which provides for the correction or modification of the record on appeal. Further, it is beyond this court's authority to take judicial notice of another court's records. See Warren v. Wester, 827 So.2d 116, 119 n. 3 (Ala.Civ.App. 2002) (recognizing that this court is not generally permitted to take judicial notice of the records of another judicial body); Worthington v. Amerson, 741 So.2d 437,438 n. 2 (Ala.Civ.App. 1999) (stating that "[g]enerally, a court may not take judicial notice of the records of another court"); and Lyle v. Eddy, 481 So.2d 395, 397 (Ala.Civ.App. 1985) (recognizing that "there is no authority allowing a judge to judicially notice the record of proceedings from a prior court").
The trial court's August 8, 2007, order denying the mother and the father's petition for return of custody does not contain specific findings of fact. "`It is . . . well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.'" Ex parte Fann, 810 So.2d 631, 633
(Ala. 2001) (quoting Ex parte Bryowsky, 676 So.2d 1322,1324 (Ala. 1996)).
Section 12-15-1(10), Ala. Code 1975, defines a dependent child, in pertinent part, as a child:
 "f. Who is in a condition or surroundings or is under [such] improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child; or
 ". . . .
 "j. Who is physically, mentally, or emotionally abused by the child's parents, guardian, or other custodian or who is without proper parental care and control necessary for the child's well-being because of the faults or habits of the child's parents, guardian, or other custodian or their neglect or refusal, when able to do so, to provide them; or
 "m. Who for any other cause is in need of the care and protection of the state; and
 "n. In any of the foregoing, is in need of care or supervision."
In addition to the evidence from the November 7, 2006, dependency hearing, the trial court considered evidence indicating that the child had suffered unexplained skull fractures while in the mother and the father's custody. Although the mother and the father complied with most of the requirements included in the ISP prepared by DHR, the evidence supports a finding that the mother and the father failed to offer a plausible explanation of how the child sustained the fractures to her skull. References made during the July 10, 2007, hearing to the deposition testimony of Dr. Amyia that was introduced at the November 7, 2006, dependency hearing indicate that Dr. Amyia's explanation of the child's injuries conflicted with the explanations given to DHR by the mother and the father. The trial court could have concluded that, based on the severity of the child's injury and the conflicting explanations of how the child was injured, the child remained dependent. Because we do not have a copy of the transcript of the November 7, 2006, dependency hearing or Dr. Amyia's deposition testimony, we must assume that evidence contained in the transcript and Dr. Amyia's deposition testimony support the trial court's decision to continue custody of the child with DHR. See Leeth v. JimWalter Homes, Inc., 789 So.2d 243, 247 (Ala.Civ.App. 2000) *Page 42 
("`[W]hen a trial court's order is based on evidence that is not before the appellate court, we conclusively presume that the court's judgment is supported by the evidence.'" (quoting'Newman v. State, 623 So.2d 1171, 1172
(Ala.Civ.App. 1993))).
In his dissent, Judge Moore concludes that the evidence elicited at the November 7, 2006, dependency hearing was irrelevant to our review of the trial court's judgment in this case because that evidence "could not have possibly been directed toward future events" and, therefore, "could not possibly supply the missing clear and convincing evidence DHR needed to prove that the child remained dependent on July 10, 2007." 992 So.2d at 54. Although we do not have a copy of the transcript of the November 7, 2006, dependency hearing, or of Dr. Amyia's deposition testimony, it is undisputed that the trial court considered at that hearing evidence regarding skull fractures that the child had sustained while in the mother and the father's custody. The evidence presented at the November 7, 2006, hearing remained relevant to the issue addressed at the July 10, 2007, hearing because, at the time of that hearing, the child's injuries remained unexplained and, therefore, the basis for the initial finding of dependency continued to exist.
Judge Moore concludes in his dissent that the dependency statute does not state that a child is dependent and remains dependent if that child has unexplained injuries. Although Judge Moore is correct that the dependency statute does not specifically provide for that particular circumstance, § 12-15-1(10)j., Ala. Code 1975, of the dependency statute defines a dependent child as one "[w]ho is physically . . . abused by the child's parents . . . or who is without proper parental care and control necessary for the child's well-being because of the faults or habits of the child's parents. . . ." The child in this case sustained injuries to her skull indicating physical abuse. The trial court could have concluded that the threat of physical injury to the child continued to exist, and, therefore, that the child remained dependent.
Judge Moore, in his dissent, effectively reweighs the evidence presented to the trial court and draws conclusions from the evidence, a function that is best left to the trial court, as the fact-finder. See Ex parte R.T.S., supra. One of the several conclusions made by Judge Moore in his dissent is that "DHR basically admitted that the child was no longer in need of DHR's protection, care, or supervision."992 So.2d at 55. Our review of the record does not support such a conclusion. Patton, the only DHR employee called to testify at the final hearing, did not testify that the child was no longer in need of DHR's protection, care, or supervision. Patton testified at length regarding the child's unexplained injuries and expressed her concern that the cause of the injuries remained unknown. It is not the function of an appellate court to advocate a position on behalf of an appellant. Schiesz v. Schiesz,941 So.2d 279 (Ala.Civ.App. 2006).
We commend the mother and the father on their efforts to regain custody of the child. It appears that they are making the necessary efforts to eventually regain custody of the child. However, we are limited in our review on appeal to the evidence that is included in the record, and we cannot presume error based on references to evidence not contained in the record. Accordingly, the judgment of the trial court is due to be affirmed.
AFFIRMED.
PITTMAN and THOMAS, JJ., concur.
BRYAN and MOORE, JJ., dissent, with writings.
[1] Methadone is "a synthetic addictive narcotic drug" used "for the relief of pain and as a substitute narcotic in the treatment of heroin addiction." Merriam-Webster's CollegiateDictionary 781 (11th ed. 2003).
[2] The record indicates an alternative spelling of this name as Dr. Michelle Amaya. *Page 43