Rel:  February 7, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

## CL-2023-0776 and CL-2023-0777

_____

## A.D.W.

## v.

## C.L.

## Appeals from Autauga Juvenile Court
## (JU-21-54.01 and JU-21-54.03)

PER CURIAM.

This is the second set of appeals filed by A.D.W. ("the mother") from a judgment entered by the Autauga Juvenile Court ("the juvenile court") declaring J.H. ("the child") to be dependent and awarding custody of the child to C.L. ("the custodian").  We set out the procedural history of the

dependency actions leading to the juvenile court's initial dependency judgment -- and the mother's first set of appeals -- in our first opinion, which we issued on November 4, 2022.  See A.D.W.H. v. C.L., 375 So. 3d 1264 (Ala. Civ. App. 2022).[1]  In A.D.W.H., we reversed a January 28, 2022, judgment entered by the juvenile court  that found the child to be dependent because, we concluded, the juvenile court had failed to hold an evidentiary hearing on the issue of the child's dependency.  375 So. 3d at 1269 ("As the mother in this case correctly contends, allegations or evidence concerning a parent's drug use are not sufficient, alone, to form the basis of a dependency finding. Moreover, the transcript of the January 25, 2022, dispositional trial not only lacks evidence supporting the conclusion that the child was dependent, but also lacks any evidence at all.").  After the issuance of our certificate of judgment, the juvenile court set the custodian's dependency action, which had been assigned case number JU-21-54.01, and a dependency action commenced by the child's maternal grandmother, J.M. ("the maternal grandmother"), which

---

[1]The record on appeal indicates that the mother and the child's father, J.A.H., divorced after the mother filed her appeals from the initial dependency judgment that resulted in our opinion in A.D.W.H.; it appears that the mother has changed her last name in these subsequent proceedings to reflect that change.

had been assigned case number JU-21-54.03, for a hearing on the mother's motion to proceed in compliance with the November 4, 2022, opinion of this court. Proceedings, including a hearing on June 14, 2023, continued in both actions, resulting in four orders that awarded pendente lite custody either solely to the custodian or jointly to the custodian and the child's father, J.A.H. ("the father").

On October 20, 2023, after the final trial concluded on October 18, 2023, the juvenile court entered in both actions a single order determining that the child remained dependent, awarding custody of the child to the custodian, and setting out specified visitation for the mother, the father, and the maternal grandmother, as well as naming the maternal grandmother as a visitation supervisor. In that order, the juvenile court ordered the mother and the father to each submit a child-support-obligation income statement/affidavit, see Rule 32(E), Ala. R. Jud. Admin., within 10 days and stated that a separate child-support order would be entered once those income affidavits were submitted to, and considered by, the court. The order also stated that, once the child-support order was entered, the juvenile court intended to close the cases to further review.

3

On November 1, 2023, the mother, through her trial counsel, filed in both actions in the juvenile court what she labeled as a postjudgment motion. On November 2, 2023, the juvenile court entered an order in both actions directing the parents to comply with the directive to submit income affidavits. On that same date, the mother, acting pro se, filed a notice of appeal to this court in both the custodian's dependency action and the maternal grandmother's dependency action; those appeals were assigned appeal numbers CL-2023-0776 and CL-2023-0777, respectively. The mother also filed her income affidavit with the juvenile court. On November 3, 2023, the maternal grandmother filed in the juvenile court what she labeled as a postjudgment motion. On that same date, the father filed his income affidavit in the juvenile court. The custodian then filed a motion in the juvenile court seeking to have the maternal grandmother removed as a named visitation supervisor.

On November 13, 2023, the juvenile court rendered two separate orders, both of which it entered in both actions. The first was an order on child support, requiring the mother and the father to pay child support to the custodian in case number JU-21-54.01 and "clos[ing] [both actions] to further review." The second order denied the "postjudgment motions"

4

filed by the mother and the maternal grandmother and the custodian's motion to remove the maternal grandmother as a named visitation supervisor. On November 17, 2023, the mother, through newly appointed appellate counsel, filed a second notice of appeal in each action; those appeals were assigned appeal numbers CL-2023-0821 and CL-2023-0822, respectively.

Because the November 13, 2023, order on child support was entered after the mother had filed her initial notices of appeal, the juvenile court lacked jurisdiction to enter that order. See Ex parte State ex rel. O.E.G., 770 So. 2d 1087, 1089 (Ala. 2000) (quoting Foster v. Greer & Sons, Inc., 446 So. 2d 605, 608 (Ala. 1984)) (explaining that, "'when an appeal is taken[,] the trial court may proceed only in matters entirely collateral to that part of the case which has been taken up by the appeal, but can do nothing in respect to any matter or question which is involved in the appeal'"). As a result, appeal numbers CL-2023-0821 and CL-2023-0822 were taken from a void order, see M.G. v. J.T., 105 So. 3d 1232, 1233 (Ala. Civ. App. 2012), and those appeals were dismissed by separate order on December 19, 2024.

Moreover, because the failure to address the child-support issue in the October 20, 2023, order rendered that order nonfinal, appeal numbers CL-2023-0776 and CL-2023-0777 arose from a nonfinal order and were also subject to dismissal. See T.H. v. Jefferson Cnty. Dep't of Hum. Res., 100 So. 3d 583, 585 (Ala. Civ. App. 2012) (dismissing an appeal from an order finding a child to be dependent because the Jefferson Juvenile Court had postponed ruling on a pending child-support claim). However, in light of the policy of the Alabama Rules of Appellate Procedure that we construe the rules to "assure the just, speedy, and inexpensive determination of every appellate proceeding on its merits," Rule 1, Ala. R. App. P., we reinvested the juvenile court with jurisdiction for 21 days for that court to reenter the child-support order in case numbers JU-21-54.01 and JU-21-54.03. In compliance with our limited remand order, the juvenile court, on December 20, 2024, reentered the child-support order, and, therefore, the October 20, 2023, order and the December 20, 2024, order amount to a final judgment capable of supporting the mother's appeals in appeal numbers CL-2023-0776 and CL-2023-0777. The parties were given the opportunity to file supplemental briefs with this court pursuant to Rule 28A, Ala. R. App. P., but they declined to do

so. Thus, we turn now to the merits of appeal numbers CL-2023-0776 and CL-2023-0777, which challenge the October 20, 2023, order.

A juvenile court's factual findings in a dependency case when the evidence has been presented ore tenus are presumed correct. T.D.P. v. D.D.P., 950 So. 2d 311 (Ala. Civ. App. 2006). A finding of dependency must be supported by clear and convincing evidence. Ala. Code 1975, § 12-15-310(b). The term "dependent child" is defined in Ala. Code 1975, § 12-15-102(8)a., in pertinent part, as follows:

"A child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:

"1. Whose parent, legal guardian, legal custodian, or other custodian subjects the child or any other child in the household to abuse, as defined in [Ala. Code 1975, §] 12-15-301[,] or neglect as defined in [§] 12-15-301, or allows the child to be so subjected.

"2. Who is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.

"….

"6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.

"....

"8. Who, for any other cause, is in need of the care and protection of the state."

The following facts were adduced at the June 14, 2023, hearing and the October 18, 2023, trial. The custodian testified that the child had lived with her for three to four years. She said that the child had first begun living with her when the Autauga County Department of Human Resources ("DHR") had initiated a safety plan after DHR had received a report that both the mother and the father were using drugs. According to the custodian, the mother had not provided for the child financially during the time that the child had lived with her. The custodian explained that the mother did not have a stable living arrangement and had recently been residing with the maternal grandmother; she also testified that the mother and the maternal grandmother had a history of domestic violence.

The custodian admitted that she did not know if the mother was employed. She further admitted that she had no proof that the mother was continuing to abuse drugs, but the mother tested positive for methamphetamine and amphetamine on court-ordered drug tests that were administered on June 21, 2023, and October 18, 2023. The

8

custodian reported that the mother's boyfriend, T.C., had been in jail at the time of the June 14, 2023, hearing. She also reported that several criminal charges were pending against the mother and stated that the mother had been in 10 different jails since April 2023.

When asked why she believed that the child remained dependent, the custodian said that she did not believe that the mother could parent the child because, she said, the mother continued to test positive for drugs, was not financially stable, and lacked stable housing of her own. She commented: "I just don't think she's ready." The custodian further observed that the mother appeared to "want[] to be [the child's] best friend and not be her mother right now."

At the June 14, 2023, hearing, K.A.M., the daughter of the custodian and the niece of the mother, testified about the family's relationships. She described the relationship between the maternal grandmother and the mother as "toxic." She explained that the mother and the maternal grandmother would fight and that the mother would then leave the house. She also explained that the maternal grandmother was "always right" in arguments between her and the mother but that if a dispute arose between the mother and another person in the family, the

9

maternal grandmother would side with the mother. The child, who testified briefly, also testified that the mother and the maternal grandmother argued "sometimes" and that it was "bad" when the two are together.

At the October 18, 2023, trial, the maternal grandmother testified that the mother had been living with her for approximately three months. She said that the mother did not pay her rent but that the mother contributed $200 or $300 when she had money to do so. She testified that the mother had been "doing better" and that they had not had any disagreements similar to a previous disagreement between them that had resulted in her having the mother arrested. According to the maternal grandmother, the mother was employed working on automobiles with T.C. in a business that they had started; she said that they both performed mechanical and interior work on automobiles. She said that neither the mother nor T.C. were licensed mechanics, that they had not yet obtained a business license, and that their business had no insurance but did not need it because "it's people that's calling her and asking her to do the work for them." She explained that the changes in the mother had been prompted by the mother's criminal charges, her

being on probation, and the threat of prison if she violated the terms of her probation, all of which, the maternal grandmother said, had "scared the hell out of her." The maternal grandmother opined that the mother had "got[ten] her act together" and indicated that the mother could properly parent the child.

Suzelle Josey, the special advocate appointed by the juvenile court, testified that she had met with the mother and had spoken with the custodian by telephone. She said that the mother had told her that she and T.C. had just started a business, but, she said, the mother had not provided any details about her income; Josey indicated that, based on that information, she did not believe that the mother could financially support the child. Josey also reported that the mother had told her that, although she had been residing with the maternal grandmother, she and T.C. had been trying to locate a house to rent; Josey said that the mother had told her that they had just located a potential rental home but had not yet secured a lease. According to Josey, those facts indicated to her that the mother was not yet stable enough to assume her role as the child's parent and that she needed more time to become "stabilized." Josey further testified that she had concerns about the mother's potential

for relapse because the mother had not sought professional help the last time that she had relapsed into drug use. Finally, Josey explained that, although the mother had indicated that she was unable to pass her drug tests due to a medical condition or prescribed medication, the mother had not provided proof of a prescription or any information from her physician relating to any medical condition that might have impacted her drug-test results.

The mother admitted that she previously had had a long-term addiction to Oxycontin. She said that it had taken her 17 years to overcome that addiction. She testified that, during the period of her addiction to Oxycontin, she had been a functioning addict. She said that she had held down a job, had paid her bills, and had provided for her older children. The mother further testified that she had been drug-free for two years despite the fact that she admittedly had failed her court-ordered drug tests.

According to the mother, she had never tested positive on any drug tests administered by her physician; she said that the drug tests that had been administered by her physician had produced negative results for illegal drugs "like always." Although the mother attempted to introduce

as evidence medical records to demonstrate that she suffered from a medical condition and took medication that would prevent her from testing negative on urine drug screens, those medical records were not admitted. The mother testified that she was "on the verge of cirrhosis of the liver" and that she suffered from kidney dysfunction. She did not provide the names of the medications that she had been prescribed or was currently taking.

The mother testified that she and T.C. had started a business and that they also "do" work for a roofing business owned by T.C. and his father. She reported that her monthly income was $3,200. She admitted that she had not paid child support to the custodian because, she said, when she had asked about the child's needs, the custodian had told her that she "had it covered." She said, however, that she had provided the child with some clothing and items related to the child's cheerleading activities. She also said that, until she had let her lease go, she had been paying $1,500 per month for rent on an apartment; she testified that she also had required money to hire an attorney to represent her on her various criminal charges and to pay restitution in some of those criminal cases.

The mother admitted that T.C. had been in jail. She testified that she had secured a business license for their business and that insurance on that business was "in the works." The mother indicated that the business had customers, stating: "I have five businesses that I have, you know, routed [sic] to work with me. I have a truck company next week that I have to paint. ... I've got contracts coming in now. ... I have quotes I have to send out to people tonight."

Regarding her criminal charges, the mother acknowledged that she had charges pending in at least six counties and that she had recently resolved charges that had been pending in Elmore County and in Autauga County. The mother testified that most of the charges stemmed from her having issued fraudulent checks; she stated that she had issued the fraudulent checks as a result of a "scam that I fell for." She testified that she had received probation in Autauga County, and the record contains a copy of the mother's sentencing documents from her Elmore County case. Those documents reflect that the mother was adjudged to be guilty of two counts of possession of a forged instrument, that she was sentenced to serve 24 months in the state penitentiary, that her sentence

14

was suspended, and that she was required to complete 18 months of probation.

The mother testified that she had been living with the maternal grandmother but that she and T.C. had found a house to rent. She indicated that she was prepared to move into the house the day following the trial. She further testified that she had recently had her driver's license reinstated and that she could provide for the child. She also said that she did not want to disrupt the child's life and that, even if the child's custody were returned to her, she intended to allow the child to continue to attend her current school, despite the fact that the mother's intended home was not in the same county, much less the same school district, as the child's current school.

The mother argues on appeal that the evidence does not support the juvenile court's conclusion that the child is dependent. Specifically, she contends that the custodian failed to establish that the mother's drug use impacted her ability to parent the child. After a review of the record, we affirm the judgment of the juvenile court.

The mother is correct that this court requires that a party petitioning to have a child declared dependent based on the drug use of a

15

parent present clear and convincing evidence that the parent's drug use impacted his or her ability to parent. See A.V. v. Houston Cnty. Dep't of Hum. Res., 353 So. 3d 1140, 1145 (Ala. Civ. App. 2021) (reversing a judgment declaring a child to be dependent because the record contained "no evidence indicating that drug use by the father had adversely affected the father's ability to care for the child"); H.A.S. v. S.F., 298 So. 3d 1092, 1103 (Ala. Civ. App. 2019) (concluding that evidence indicating that a mother had used marijuana was not clear and convincing evidence sufficient to support the conclusion that her child was dependent in her custody based on the mother's drug use when "no evidence in the record indicated that the mother's drug use had actually impacted her ability to rear [her] child"). The record in the present cases demonstrates that the mother's continued drug use, coupled with her instability, the history of volatility between her and the maternal grandmother, and her felony convictions and numerous unresolved criminal charges, have impacted her ability to parent the child. The mother and the maternal grandmother, with whom the mother had frequently resided and was residing at the time of the October 18, 2023, trial, have what was described by K.A.M. as a toxic relationship. Although she testified that

16

the mother's behavior had improved once she realized that she might be at risk of incarceration, the maternal grandmother herself admitted that she and the mother had a history of volatility, even to the point of the mother's being arrested after an altercation between them. The mother has incurred numerous criminal charges in multiple counties and has been convicted of at least two felonies. Although the mother was on probation, she had continued to test positive for drugs when tested by the juvenile court, which could result in a revocation of her probation. As of October 18, 2023, the mother had not secured her own housing, having instead resided with the maternal grandmother without paying rent, despite having testified that her income exceeded $3,000 per month. In light of her failure to provide monetary support to the custodian or to pay the maternal grandmother rent or other regular amounts for her lodging, the juvenile court was not required to believe the mother's testimony that she earned ample income to support the child.

A juvenile court may consider the totality of the circumstances when making a determination regarding the dependency of a child. T.D. v. S.R., 293 So. 3d 434, 436 (Ala. Civ. App. 2019); G.C. v. G.D., 712 So. 2d 1091, 1094 (Ala. Civ. App. 1997). The totality of the mother's

17

circumstances indicate that she is still using drugs, has an unstable lifestyle, does not have stable income, is a convicted felon, and faces several additional criminal charges. Accordingly, we affirm the judgment of the juvenile court determining that the child is a dependent child.[2]

CL-2023-0776 -- AFFIRMED.

CL-2023-0777 -- AFFIRMED.

All the judges concur.

---

[2]The mother has not made any argument in her appellate brief relating to the award of custody of the child to the custodian and has therefore waived any argument that the child's best interest is not promoted by an award of her custody to the custodian. See A.B. v. Montgomery Cnty. Dep't of Hum. Res., 370 So. 3d 822, 829 (Ala. Civ. App. 2022); see also L.C. v. Jefferson Cnty. Dep't of Hum. Res., 330 So. 3d 849, 857 (Ala. Civ. App. 2021) ("It is well settled that arguments not raised in an appellate brief are deemed waived."). The mother also does not make any argument relating to the child-support award, and, therefore, any such issue is deemed to have been waived. See A.B., 370 So. 3d at 829; see also L.C., 330 So. 3d at 857.