MOORE, Judge.
D.W., the maternal great-aunt of W.T.D. ("the child"), appeals from a judgment entered by the Montgomery Juvenile Court ("the juvenile court") in several related actions concerning the child to the extent that it awarded custody of the child to M.M., the child's biological father. We reverse the juvenile court's judgment and remand the cases for the juvenile court to enter a new custody award.
Procedural History
On August 13, 2015, D.W. ("the maternal great-aunt") filed a dependency petition seeking custody of the child, whose date of birth is April 25, 2009; that petition was assigned case number JU-15-546.01 ("the .01 action"). She alleged that the child's mother, C.W. ("the mother"), had a history of abusing illegal substances and that, since February 20, 2015, the child had been living with the maternal great-aunt pursuant to a safety plan entered into with the Montgomery County Department of Human Resources ("DHR"). The maternal great-aunt listed A.D.G., the child's stepfather, as being the father of the child.
After a hearing, at which it was made known to the juvenile court that M.M. is the biological father of the child, the juvenile court entered a judgment in the .01 action, on March 3, 2016, finding the child dependent, awarding DHR legal custody of the child, awarding the mother unsupervised overnight visitation as mutually agreed upon by the parties, setting the case for a dispositional hearing, and ordering the maternal great-aunt to provide current information regarding the location of M.M. ("the father").
On May 19, 2016, the mother filed a petition requesting that the child be returned to her custody; that petition was assigned case number JU-15-546.02 ("the .02 action"). On May 23, 2016, the mother's attorney notified the juvenile court that the mother had died. The juvenile court dismissed the mother's petition in the .02 action on May 25, 2016.
On June 24, 2016, DHR filed a motion requesting that the juvenile court correct a scrivener's error in the March 3, 2016, judgment entered in the .01 action regarding the legal custody of the child. On that same date, the juvenile court entered, in the .01 action, an amended judgment that, among other things, awarded the maternal great-aunt legal custody of the child and ordered DHR to provide protective services. The juvenile court also noted that the .01 action was set for a dispositional hearing and again ordered the maternal great-aunt to provide information regarding the location of the father.
On July 25, 2016, the father filed a dependency petition and requested custody of the child; that petition was assigned case number JU-15-546.03 ("the .03 action"). On November 2, 2016, the father filed, in the .01 action, a motion alleging that his paternity of the child had never been established and requesting that the juvenile court establish his paternity of the child. On November 3, 2016, the juvenile court ordered, in the .01 action, a "DNA/Genetic Screening." After a hearing on April 28, 2017, in the .01 action and the .03 action, the juvenile court entered, in *1109 the .01 action, an order awarding the father supervised visits and telephone contact with the child.
At a hearing held on July 6, 2017, in the .01 action and the .03 action, the paternity results were presented to the juvenile court; those results indicated that there was a 99.9% probability that the father was the child's biological father. The father also presented to the juvenile court a judgment entered on November 10, 2010, by the 126th Judicial District Court of Travis County, Texas ("the Texas court"); in that judgment, the Texas Court, among other things, found the father to be the child's biological father, appointed the father and the mother as "Joint Managing Conservators of the child," awarded the mother the right to determine the child's primary residence, ordered the father to pay prospective and retroactive child support, and awarded the father visitation with the child. The father represented that, unknown to him, his mother had been in possession of the judgment of the Texas court and that he and his mother had discovered that judgment only when he returned to Texas after the April 28, 2017, hearing. Also at the July 6, 2017, hearing, the child's guardian ad litem recommended that the father be awarded sole physical custody of the child. In addition, the maternal great-aunt's attorney submitted that the maternal great-aunt would agree to the father's exercising visitation "for a few days" if the child wanted to visit with the father and the father submitted to and passed a drug test. The father declined to submit to a drug test.
The juvenile court thereafter entered an order on July 21, 2017, in the .01 action and the .03 action, directing the parties to maintain the status quo pending the juvenile court's contacting the Texas court regarding jurisdiction. On October 3, 2017, the Texas court entered an order declining to exercise jurisdiction over the custody of the child.
On September 28, 2017, A.D.G. ("the stepfather") filed a dependency petition requesting that he and the maternal great-aunt be awarded joint custody of the child; the stepfather's petition was assigned case number JU-15-546.04 ("the .04 action").
The final dispositional hearing on all the dependency petitions took place on October 22, 2017. Thereafter, on November 6, 2017, the guardian ad litem submitted a report stating, among other things:
"The [guardian ad litem] has significant concern about the [f]ather's long-term history and current evidence of drug use. The [guardian ad litem] has further concerns that the ... [f]ather spent more than one-third of the past 18 years incarcerated, coupled with the fact that he continues to engage in the use of illegal drugs. Although certain states may have legalized marijuana, the ... [f]ather does not live in any of these states. Should he be arrested for possession of marijuana, the [guardian ad litem] has concerns for the well being of the child if placed in his care."
On November 13, 2017, the juvenile court rendered and entered a single "final dispositional order of custody" in the .01 action, the .03 action, and the .04 action. That judgment found the child to be "dependent or neglected"; denied the maternal great-aunt's petition for custody in the .01 action; denied the petition filed by the stepfather in the .04 action in which he requested that he and the maternal great-aunt be awarded joint custody of the child; granted the father's petition for custody in the .03 action and awarded him temporary legal and physical custody of the child, with directions that the child remain with the maternal great-aunt until the 2017 school Christmas break. The judgment also awarded the stepfather and the maternal *1110 great-aunt visitation "as the parties can mutually agree"; ordered that, "to the extent possible, [DHR] shall maintain Protective Supervision over the child for a period of ninety (90) days ... in consultation with the State of Texas"; and closed the cases to further review. The juvenile court's judgment stated, in pertinent part:
"The [m]other apparently left the Texas Jurisdiction with the child and relocated for a period of time in Montgomery, Alabama, until her death, thereby leaving the child in the care of the [maternal great-aunt]. The [m]other and the child had for a period of time traveled between Texas and Alabama, as the [m]other was still married to [the stepfather]. Though paternity had been established in [the father], the child was not told this fact, and while he knew [the father], he did not know him as his father; instead, he knew ... the stepfather as his father. [The father] has known that he was the father of the child, and has in the past had contact and visitation with him; and has since the filing of the petitions herein increased his contact and visitation with the child. The child has also been able to visit with his siblings who reside in the home of the [f]ather.... It was clear that the [f]ather has had some involvement with the criminal justice system and has criminal convictions, including convictions for the possession of drugs. He asserted that he has not been involved in any such activity in the recent past and now owns his own business and is supporting his wife and family. There was also testimony that the [m]other, during the time she held custody of the child, was addicted to prescription drugs and engaged in the illegal use of the same; further the stepfather ... has been convicted of some drug possession, which he asserts he incurred to protect the [m]other. Aside from the [f]ather's involvement with the prior drug possession and use, there was no evidence that he is unable or unwilling to care and provide for his own son; especially in light of the Texas order which vested him with joint custody of the child. The Court does however believe that the child should be afforded an opportunity to transition into the care of [the f]ather, while also maintaining some degree of a relationship with [the stepfather] as well as the [maternal] great-aunt."
(Emphasis added.)
On November 20, 2017, the guardian ad litem filed a postjudgment motion. On November 22, 2017, the maternal great-aunt filed a postjudgment motion and a notice of appeal.[1] The postjudgment motion filed by the guardian ad litem was denied by operation of law on December 4, 2017, and the maternal great-aunt's postjudgment was denied by operation of law on December 6, 2017. See Rule 1(B), Ala. R. Juv. P. Pursuant to Rule 4(a)(5), Ala. R. App. P., the maternal great-aunt's notice of appeal became effective on December 6, 2017, the date of disposition of the last filed postjudgment motion. On December 15, 2017, this court entered an order staying the juvenile court's judgment.
Facts
The maternal great-aunt resides in Alabama, and both the father and the stepfather reside in Texas. The evidence indicates that the mother married the stepfather shortly after the child was born. The evidence is undisputed that the child had known the stepfather as his father and had called him "Daddy." The maternal great-aunt and the stepfather *1111 testified that the stepfather had provided for the child since his birth.
The stepfather testified he had been present for the child's birth. He testified that he had taken a DNA test when the child was approximately one month old and that the results of that test had indicated that he was not the biological father of the child. He testified that, after seeing the results of the DNA test, the mother had told him that M.M. must be the child's father.
The stepfather testified that, for the first four years of the child's life, the child had lived with the stepfather and the mother in Texas. He testified that, around 2012 or 2013, the mother began traveling to Alabama. The maternal great-aunt testified that the mother and the child had begun staying with her in Alabama for periods but that they would also return to Texas for periods to stay with the stepfather. The maternal great-aunt and the stepfather agreed that the maternal great-aunt had provided care for the child for at least four years before the dispositional hearing. The maternal great-aunt testified that, at one point, the father had telephoned her expressing concern that the mother might be placing the child in foster care. She testified that she had told the father that the child was with her, and, she said, the father had indicated his agreement with that arrangement.
At the March 3, 2016, hearing, the stepfather testified that he had last seen the child in February 2015, although, he said, he had tried to visit the child in Alabama once or twice a year. The maternal great-aunt testified that the child speaks with the stepfather via telephone once a day before school. The stepfather testified that he does not use drugs but that he had been charged with possession of a controlled substance after the mother had left a bottle of drugs in his vehicle. He testified that, at the time of the dispositional hearing, he remained on probation as a result of that incident.
The child testified that he knows the stepfather as his "dad," that the stepfather had helped raise him, and that he wanted to live with the stepfather. He admitted that he had visited the father during the pendency of these cases, that he had enjoyed those visits, and that the father had taken care of him during those visits. A DHR court report admitted into evidence indicates that the child "does not wish to reside in the home with [the father,] does not have a positive light of his relationship with [the father,] does not know [the] father[,] and would not feel comfortable living in the home with him." The evidence indicates that, although the child had known the father, he had not known that the father was, in fact, his biological father until the child's guardian ad litem had informed him of that fact during the pendency of these cases.
The father testified that the mother had told him that the stepfather was the child's biological father. He testified, however, that he had suspected that he was the child's biological father. He testified further that he had known, by looking at the child, that the child was his biological child but that he had not known for certain until he had seen the paternity-test results during the pendency of these cases. When asked why he had not attempted to assert his rights as a father until the pendency of these cases, the father stated that the mother had been caring for the child and that he did not want to take the child away from the mother and that the stepfather was adequately serving as a "father figure" for the child. The father testified that he had never been served in the action in the Texas court but that he had discovered the existence of that court's judgment during the pendency of these cases. He testified that he had not paid any child support *1112 formally but that he had given the mother "a lot" of money and had provided gifts for the child.
DHR requested a recommendation from the Texas Department of Family and Protective Services concerning placement of the child with the father. That agency completed an assessment concerning the father and recommended that the child not be placed with the father. The report from the Texas Department of Family and Protective Services noted that the father has an extensive criminal history, mostly involving evading arrest and possession of controlled substances. The father's most recent conviction before the dispositional hearing had originated in 2014 from a possession-of-marijuana charge; he served six months in the county jail on that conviction and was released from jail in May 2016. The report further indicated that the father had sold drugs as his means of support until 2014. The father's live-in girlfriend testified that, despite having known about the father's drug-related activities, she had continued to reside with him and raise their children in the home with him.
The father testified at the dispositional hearing that he works full time doing construction and that he no longer sells or uses drugs. However, when the juvenile court requested that he submit to a drug test, the father admitted that he would test positive for marijuana. His drug screen was, in fact, positive for marijuana.
DHR recommended that the child remain in the custody of the maternal great-aunt.
Standard of Review
"Once a child is found dependent, a juvenile court may dispose of the custody of the child according to its determination of the best interests of the child. See § 12-15-314, Ala. Code 1975.
" ' In Ex parte Alabama Department of Human Resources, 682 So.2d 459 (Ala. 1996), the Alabama Supreme Court stated the applicable principles of appellate review in the context of a challenge to a juvenile court's custodial disposition of a dependent child:
" ' "Appellate review is limited in cases where the evidence is presented to the trial court ore tenus. In a child custody case, an appellate court presumes the trial court's findings to be correct and will not reverse without proof of a clear abuse of discretion or plain error. Reuter v. Neese, 586 So.2d 232 (Ala. Civ. App. 1991) ; J.S. v. D.S., 586 So.2d 944 (Ala. Civ. App. 1991). This presumption is especially applicable where the evidence is conflicting. Ex Parte P.G.B., 600 So.2d 259, 261 (Ala. 1992). An appellate court will not reverse the trial court's judgment based on the trial court's findings of fact unless the findings are so poorly supported by the evidence as to be plainly and palpably wrong. See Ex Parte Walters, 580 So.2d 1352 (Ala. 1991).
" ' 682 So. 2d at 460.'
" J.J. v. J.H.W., 27 So.3d 519, 522 (Ala. Civ. App. 2008)."
M.M. v. Colbert Cty. Dep't of Human Res., 117 So.3d 376, 382-83 (Ala. Civ. App. 2013).
Discussion
At common law, the father of a child was entitled to custody of his child vis à vis a nonparent unless clear and convincing evidence proved that the father was unfit for custody or had voluntarily forfeited his right to custody. See Ex parte Terry, 494 So.2d 628 (Ala 1986). In the dispositional phase of a dependency proceeding, however, the father of a child does not have any presumptive right to custody of his child as against more distant relatives. See J.P. v. S.S., 989 So.2d 591, 600 (Ala. Civ. App. 2008). Rather, the Alabama Legislature has determined that a *1113 juvenile court shall dispose of the custody of a dependent child based solely on the considerations of the welfare and best interests of that child. See Ala. Code 1975, § 12-15-314.
By that standard, when a parent has for a long time voluntarily allowed a child to live in the family of another, during which time that family has conscientiously and duly administered to the needs of the child such that the child has developed a matured and considered preference to remain in the custody and care of his or her new family, a court shall not use its coercive powers to change custody of the child simply in order to enforce the mere legal rights of a parent. See Garrett v. Mahaley, 199 Ala. 606, 608, 75 So. 10, 11 (1917). Even in cases in which a parent can better provide for the material needs of a child for food, clothing, shelter, medicine, education, and the other necessities of life, a court may not lightly disrupt a suitable custody arrangement that has been beneficial to the emotional and other intangible needs of the child. As then Justice Stuart explained: "[T]he court or the agency determining the best interest of the child must give great weight to the stability, security, and permanency of the relationship between the child and the child's caregiver." Ex parte T.V., 971 So.2d 1, 12 (Ala. 2007) (Stuart, J., dissenting).
In the present cases, the juvenile court expressly found in its judgment that the father had known that he was the biological father of the child. Despite that knowledge, the father had been content for years to fail to assert his parental rights and responsibilities to and for the child. The father acknowledged that he had allowed the child to be raised by the mother and the stepfather during the first four years of the life of the child. During that time, the stepfather assumed the paternal role for the child. Although the father apparently sporadically visited with the child during that time, it is apparent from the record that the father did not inform the child of his paternity or assume a fatherly relationship with the child. After the mother moved to Alabama, the father learned that the child was residing in the care and custody of the maternal great-aunt, who testified without contradiction that the father had acquiesced to that custodial arrangement. Although the juvenile court's statements appear to place the blame on persons other than the father, the evidence is clear that, at least in part due to the father's deliberate inaction, the child, who was eight years old at the time of the dispositional hearing, did not know the father as his father.
The evidence is further undisputed that, at the time of the dispositional hearing, the child had been residing off and on with the maternal great-aunt for many years and had been living exclusively with the maternal great-aunt since February 2015 when the child was placed in her custody pursuant to a safety plan entered into with DHR. DHR, the state agency charged with overseeing the welfare of dependent children, investigated the matter, determined that the maternal great-aunt had been providing a suitable home environment for the child, and recommended that the child remain in the custody of the maternal great-aunt.
Given those circumstances, this court can sustain the judgment of the juvenile court only if the evidence in the record shows that the best interests of the child would be served by removing the child from his home of the last four years and placing him in the custody of the father. See M.F. v. W.W., 144 So.3d 366, 369 (Ala. Civ. App. 2013) ("Before custody of a child can be awarded to a parent with whom the child ... has never resided or with whom the child has never developed a [parent-child] relationship, evidence must be adduced *1114 from which the trial court can determine whether such an award is in the child's best interest."). However, the record contains no evidence showing how the change of custody would benefit the child. In its judgment, the juvenile court found that the father's extensive criminal history and marijuana usage did not disqualify the father from gaining custody of the child, and the juvenile court expressed its belief that the father had reformed his lifestyle; those findings do not, however, equate to a determination that the best interests of the child would be served by his being placed into the custody of the father.
It appears from the statements made by the juvenile court and the tenor of its judgment that the juvenile court emphasized the biological connection between the father and the child and the legal rights of the father to custody of the child as established in the 2010 judgment entered by the Texas court rather than focusing on the welfare and the best interests of the child as § 12-15-314 requires. We could find no evidence in the record that would support a finding that placement with the father will somehow advance the child's best interests. We therefore hold that the juvenile court's finding that an award of custody to the father is in the best interests of the child is " ' "so poorly supported by the evidence as to be plainly and palpably wrong." ' " M.M., 117 So.3d at 383. Accordingly, we reverse the juvenile court's November 13, 2017, judgment to the extent that it awarded custody of the child to the father, and we remand these cases for the juvenile court to enter an award of custody that is consistent with the best interests of the child.
2170223-REVERSED AND REMANDED WITH INSTRUCTIONS.
2170225-REVERSED AND REMANDED WITH INSTRUCTIONS.
2170226-REVERSED AND REMANDED WITH INSTRUCTIONS.
Thompson, P.J., and Pittman, Thomas, and Donaldson, JJ., concur.

The maternal great-aunt's notice of appeal was held in abeyance pending the disposition of the postjudgment motions. See Rule 4(a)(5), Ala. R. App. P.