REL:  February 3, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

_____

### 2210396 and 2210397

_____

### H.T.

### v.

### A.C. and Calhoun County Department of Human Resources

### Appeals from Calhoun Juvenile Court
### (JU-20-542.01 and JU-20-543.01)

_____

### 2210398

_____

### H.T.

### v.

### G.T., J.T., and Calhoun County Department of Human Resources

### Appeal from Calhoun Juvenile Court
### (JU-20-546.01)

2210396, 2210397, and 2210398

EDWARDS, Judge.

In July 2020, the Calhoun County Department of Human Resources ("DHR") filed petitions in the Calhoun Juvenile Court ("the juvenile court") seeking to have S.T., L.T., and K.T. ("the children") declared dependent; those actions were assigned case numbers JU-20-542.01, JU-20-543.01, and JU-20-546.01, respectively. S.T. and L.T. ("the daughters") are the daughters of A.B.C. and H.T. ("the father"). K.T. ("the son") is the son of the father and A.M. The juvenile court entered judgments in November 2020 declaring the children to be dependent; those judgments indicated that the determinations of dependency were based on an agreement of the parties. The children were placed in the custody of DHR.

In December 2020, G.T. and J.T. ("the intervenors"), who are the maternal great-aunt and the maternal great-uncle of the son, filed in case number a motion to intervene and a complaint seeking custody of the son. The juvenile court granted the motion to intervene. The intervenors had served as a placement for the son beginning in late July 2020. The father and A.M. answered the intervenors' custody complaint.

2

2210396, 2210397, and 2210398

In July 2021, the father filed in all three actions what he entitled a "Motion for Placement." In those motions, the father alleged that he had completed all services that DHR had offered to him, that he had stable employment and a stable residence, and that he was ready, willing, and able to serve as the children's parent. The juvenile court denied the father's motions the day after they were filed. On the motion of the guardian ad litem that had been appointed for the children, the juvenile court consolidated all the actions.

In September 2021, the guardian ad litem filed a motion in case numbers JU-20-542.01 and JU-20-543.01 seeking to transfer custody of the daughters to their maternal aunt, A.C. ("the maternal aunt"), who was currently serving as their placement. The father filed a response to the guardian ad litem's motion in both actions and also filed in both actions a motion to restore custody of the daughters to him, alleging again that he had completed all services that DHR had offered to him and was a fit and proper person to have custody of the daughters. The juvenile court set both the motions of the guardian ad litem and the motions of the father for a trial to be held in November 2021.

3

2210396, 2210397, and 2210398

After the consolidated dispositional trial in all three actions, which was held on November 15, 2021, and December 13, 2021, the juvenile court entered a dispositional judgment in each action on January 10, 2022, finding that the children remained dependent. In the judgments entered in case numbers JU-20-542.01 and JU-20-543.01, the juvenile court awarded custody of the daughters to the maternal aunt. In the judgment entered in case number JU-20-546.01, the juvenile court awarded custody of the son to the intervenors. The father filed postjudgment motions in all three actions, which the trial court denied on February 3, 2022, after having held a hearing.

The father filed a timely notice of appeal in each action.[1] The notices of appeal filed in case numbers JU-20-542.01 and JU-20-543.01 named the maternal aunt as an appellee. The notices of appeal did not, however, list the maternal aunt as a party upon whom the notices of

---

[1]The appeal of the judgment entered in case number JU-20-542.01 was assigned appeal number 2210396; the appeal of the judgment entered in case number JU-20-543.01 was assigned appeal number 2210397; and the appeal of the judgment entered in case number JU-20-546.01 was assigned appeal number 2210398. Neither A.M. nor A.B.C. appealed the judgments.

4

appeal would be served. In May 2022, the father filed a motion in this court seeking to have the maternal aunt dismissed as an appellee, indicating in that motion that "they [sic] were added in error." This court granted the father's motion and dismissed the maternal aunt as an appellee. However, upon submission of the appeals, this court determined that, because the father was seeking review of the judgments entered in case numbers JU-20-542.01 and JU-20-543.01 on the ground that the juvenile court could not have properly awarded custody of the daughters to the maternal aunt, a nonparent, the maternal aunt must necessarily be an appellee. We ordered that the maternal aunt be restored as an appellee, that she be served with a copy of the notices of appeal, that she be served with the brief filed by the father and DHR, and that she be granted 28 days to either file a brief or to notify this court that she would not be filing a brief. That period expired without the maternal aunt ever filing a brief, and the appeals, which we consolidated ex mero motu, are now ripe for our review.

The record on appeal contains the transcript of an August 2021 permanency hearing relating to the son and to M.W., another child of

5

A.M. who is not related to the father, and the transcript of the trial held in November and December 2021. The testimony relevant to the father and the children reveals that the father had been living with A.M. in early 2020. However, in April 2020, A.M. tested positive for marijuana. A.M.'s testimony indicated that DHR had implemented a safety plan in April 2020, but the record contains only two safety plans, which were implemented in June 2020 and in July 2020, respectively. Pursuant to the June 2020 safety plan, which was implemented after an alleged incident of domestic violence between A.M. and the father that allegedly occurred in June 2020, the son was placed in the home of S.L. According to A.M., in June 2020, she had resided in the same residence with S.L. and the son. A.M. testified that, in July 2020, DHR had learned that A.M. had been caring for the son while unsupervised and that DHR had then terminated the safety plan with S.L. A.M. testified, and the July 2020 safety plan contained in the record indicates, that, following the termination of the June 2020 safety plan, DHR instituted a new safety plan for the son, pursuant to which he was placed with the intervenors.

Neither safety plan contained in the record on appeal concerns the daughters.  The father's testimony and the dependency petitions relating to the daughters indicated that they had been residing with the father and A.M. pursuant to a safety plan because their mother, A.B.C., and her boyfriend, W.M., had tested positive for several illegal drugs in or around April 2020.  The dependency petitions also mention the alleged incident of domestic violence between A.M. and the father but do not indicate when the daughters were placed with the maternal aunt.  During her testimony, the maternal aunt indicated that the daughters had initially been placed with their maternal great-grandmother but that she had moved in December 2020; thus, although it is not clear from the record, it appears that the daughters may have been placed with the maternal aunt in or around December 2020.

The father and A.M. testified about the alleged incident of domestic violence in June 2020.  A.M. testified that, although she had, in fact, filed a protection-from-abuse ("PFA") petition and had received an ex parte PFA order, the allegations that she had made in that petition were at least partly untrue.  She denied that the father had been physically

7

violent with her at any time, but she admitted that he may have engaged in verbal abuse, including calling her a "worthless piece of shit" and a "dumb bitch." She said that the father had acted in anger during the June 2020 incident and said that they were "past that"; she indicated that the services provided by DHR had been helpful to the father and said that he "was not the same man he used to be." The father also denied having engaged in any physical abuse of A.M. but admitted to calling her the above-described names and saying other hurtful things. The father had successfully had the ex parte PFA order set aside after a hearing at which he denied that the allegations in the PFA petition were true; A.M. had not appeared at that hearing. The June 2020 safety plan indicated that A.M. and the father "cannot control their behavior as evidenced by [the father's] testing positive for alcohol and [A.M.'s] testing positive for THC and alcohol following a domestic violence dispute between them."

According to the father, when DHR first became involved with him and A.M., DHR had "indicated" him for domestic violence and alcohol use. He said that he had appealed that finding and that, after a review, DHR had amended the indicated finding to only "alcohol." The record contains

8

no documentation of any "indicated" or "not indicated" findings relating to the father. He testified that DHR had required that he submit to color-code drug testing, an anger-management assessment, a domestic-violence assessment, and a parenting assessment. The father said that only the anger-management assessment had indicated that he had required services and that he had completed an online anger-management course. He also said that he had submitted to random drug tests and that the result of only one test had come back indicated for methamphetamine, which, he said, he had proven was a false positive with a subsequent drug test. The father admitted that he takes the drug Adderall, which is prescribed to him by a physician to treat attention-deficit disorder.

The father testified that he had never used illicit drugs and that he had last drank alcohol around a year and a half before the trial. He also testified that, although he had tested positive for alcohol the day after the alleged domestic-violence incident, he had not been under the influence of alcohol on the day of the alleged incident. He testified at the

9

trial that he and A.M. had ended their romantic relationship in August 2021 but that they remained friends and were good coparents.

The father further said that he had moved out of the residence he had shared with A.M. and that he intended to purchase a mobile home. He denied that A.M. had spent the night at his new residence despite the fact that her vehicle had been seen parked outside the residence at 1:00 a.m. He explained that he had borrowed her vehicle while his vehicle was in the repair shop. He also denied that he was living with A.M. when A.B.C. had moved into A.M.'s residence for approximately one week. He said, however, that he was aware that A.M. was allowing A.B.C. to move into A.M.'s residence to help A.B.C. out and that he and A.M. had discussed the fact that they should require A.B.C. to prove that she was not using drugs. The father testified that A.B.C. had passed a drug test requested by a potential employer around the time that she moved into A.M.'s residence but that A.M. had kicked A.B.C. out when A.B.C. refused to take another drug test. The father denied that he had told A.M. to allow A.B.C. to move in or to kick out A.B.C.; he said that he had simply advised A.M. about the situation.

According to the father, at the time of the trial in November 2021, he was employed by a company that contracted drivers to work for Federal Express. At that time, he testified that he worked six days per week. He explained in December 2021 at the second day of trial that he had changed to a different contracting company so that his hours would be more flexible. He said that, at his new job, he typically worked four or five days per week but said that he might work more during the holiday season. He testified that his typical hours were from 9:00 a.m. to 3:00 p.m. or 4:00 p.m.

In November 2021, on the first day of the trial, the father testified that he had not been regularly visiting the son, that "it had been a while" since he had last visited with the son, and that he had seen the son at some point during the son's unsupervised visitation with A.M. during a two-month period in June and July 2021. He indicated that he had chosen not to visit the son on his own because A.M. was visiting the son and he was visiting the daughters. He specifically testified that he and the mother "tag-teamed it" and had decided that "she would work with [the son] and [he would] work with [the daughters]." He also said that

11

he had felt like DHR was more concerned with the intervenors than with him having visits with the son and that "they" were against him seeing the son, so he had "wanted to keep everyone happy [and to] wait for his time in court." On the second day of the trial in December 2021, the father testified that he had been hampered in visiting the son by his long work hours. The juvenile court reminded the father that his testimony in November 2021 had been different and asked the father again why he had not been visiting the son; the father said that he had chosen not to see the son because he was working long hours to save up money "to get the wheels rolling on getting [the] son back" and that he would get off of work after DHR's offices were closed for the day.

G.T. testified that she is the maternal aunt of A.M. She said that she and her husband, J.T., had provided care to the son, who suffers from cerebral palsy caused by his exposure to the disease HSV-1, which had resulted in his contracting encephalitis. At the time of the trial, the son, who was born in October 2019, did not speak, had not yet crawled or walked, could not feed himself, and ate only pureed foods because he was not able to chew. The son's exposure to HSV-1 was not the fault of the

12

parents; in fact, testimony indicated that G.T. had transmitted the virus to the son when he was a newborn. G.T. testified that she had been present at the hospital when the son was born and that she had assisted A.M. after the child's birth by accompanying her to medical appointments for most of the son's infancy. According to G.T., the father had not attended the appointments and was not well-versed regarding the care that the son needed.

G.T. said that the father had not paid any child support and had not visited the son at her home or at DHR's offices; she indicated, however, that the father may have visited with the son when A.M. had unsupervised visitation in June and July 2021. According to G.T., the father had not attended an individualized-service-plan meeting since July 2020. She admitted that she and the father did not have a good relationship and that she had refused to supervise his visitation at her home. However, she testified that she would have gladly taken the son to DHR's offices had the father arranged for visitation there. When questioned about why she did not want to have contact with the father, she explained that the father had harassed her via text message and had

13

even recorded her and the son on video at a gas station when she and the father happened to run into each other. J.T. testified that, during the incident at the gas station, the father had belittled G.T. and "was ugly to her"; J.T. said that he did not want the father to visit at his home because of the aggression that he had shown during the incident at the gas station. In addition, G.T. recounted an incident at DHR's offices when the father had harassed her and J.T. by taunting them and recording them on video; she said that they had asked the father to stop and had ultimately left the office to avoid further confrontation. G.T. also explained that she had never liked the way that the father had treated A.M. She said that A.M. had admitted to her that the father had been verbally abusive during their relationship.

The maternal aunt testified that she was A.B.C.'s sister and that the daughters were her nieces. She testified that she had routinely supervised the father's visits with the daughters and that they had interacted well during those visits. When asked about concerns that she might have about the father, the maternal aunt mentioned that her concerns stemmed from her knowledge that the father had been abusive

14

to A.B.C. in front of the daughters at some point in the past; however, the maternal aunt said, she had no other concerns about the father's ability to care for the daughters. Regarding A.B.C., the maternal aunt testified that A.B.C. had moved in with the father and A.M. for about a week after A.B.C.'s residence was destroyed in a fire.

The maternal aunt, who works at the same Federal Express facility as the father, further testified that the father would sometimes approach her at work but that she would not engage with him if he spoke to her. She indicated that she had had little interaction with the father but also indicated that he had been confrontational toward her. She said that once he had told her, "I think you need to get home to my kids," as she was leaving work one evening. She also testified that she had learned that the father had taken photos or a video of the children at a pool to which the maternal aunt had taken them to go swimming; she said that the father had not approached her at that time and that she had not known that he had been there until she later learned of the photos or the video.

15

James Marinos, the DHR caseworker assigned to the family's cases in August 2021, testified at the August 2021 hearing and at the trial. He admitted that he had not known A.M. or the father for very long and that he could not provide testimony relating to whether either had benefited from the services that DHR had provided to them. He testified that both A.M. and the father had completed all services that DHR had implemented and that he had not recommended that they be provided further services. Marinos also testified that he had no concerns about the father's alcohol use, that he was not concerned about the father's protective capacity, and that he had not been informed of any further incidents of domestic violence or "anger disorder." The only complaint Marinos had about the father was that his home, which Marinos had made a scheduled visit to, was "too neat" and "appeared staged." However, Marinos admitted that the father may have cleaned the home in preparation for his visit and said that the father's home contained furniture, clothing, and food.

We first address the father's argument that the children should have been returned to his custody because, he says, "'the granting of

16

temporary custody to a non-parent, that is in the nature of pendente lite relief, does not defeat the presumption in favor of the natural parent.'" N.G. v. L.A., 790 So. 2d 262, 265 (Ala. Civ. App. 2000) (quoting J.F. v. A.G., 607 So. 2d 234 (Ala. Civ. App. 1991)). The father does not explain what custody order he contends was "in the nature of pendente lite relief," and we do not see any such orders in the record. The November 2020 dependency judgments entered in each case were not pendente lite orders. See C.L. v. D.H., 916 So. 2d 622, 626 (Ala. Civ. App. 2005) (explaining that "an adjudication of dependency and an accompanying custodial placement of a child in a dependency proceeding is an appealable order," despite the fact that other proceedings may be contemplated at a later date, provided that the juvenile court has considered all the evidence concerning the current state of the children and later proceedings will turn on new evidence). Accordingly, we reject the father's argument on this point.

The father, relying on Ex parte Mathews, 428 So. 2d 58, 59 (Ala. 1983), next argues that the juvenile court's judgments awarding custody of the children to nonparents should be reversed because the juvenile

court did not find the father to be unfit. The father contends that, as a parent, he had a prima facie right to the custody of the children. See Ex parte Mathews, 428 So. 2d at 59 ("The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that this primary parental right of custody is in the best interest and welfare of the child as a matter of law."). However, in making this argument, the father overlooks the fact that the juvenile court had previously determined that the children were dependent and awarded their custody to DHR in the November 2020 judgment. Once that occurred, the juvenile court was not required to determine that the father was unfit in order to award custody of the children to the intervenors and the maternal aunt.

Instead, the juvenile court, having initially determined the children's dependency and having determined that the children remained dependent in 2021, had the authority to make a custodial disposition of the children under Ala. Code 1975, § 12-15-314(a)(3). We explained in P.D. v. S.S., 67 So. 3d 128, 131-32 (Ala. Civ. App. 2011), that the parental presumption "applies in child-custody disputes between a parent and

18

nonparent; it does not apply if the child or children, the custody of whom is disputed, have been found to be dependent." More recently, we stated that "[i]n the dispositional phase of a dependency proceeding, however, the father of a child does not have any presumptive right to custody of his child as against more distant relatives." D.W. v. M.M., 272 So. 3d 1107, 1112 (Ala. Civ. App. 2018). Thus, we must reject the father's argument that the juvenile court's judgments should be reversed because they did not determine that he was unfit. However, the father's challenge regarding the failure to find him unfit is akin to a challenge to the juvenile court's findings of continued dependency of the children, and we will therefore consider whether the evidence supports the findings of dependency of the children.

As Judge Moore explained in his dissent in J.B. v. Cleburne County Department of Human Resources, 992 So. 2d 34, 49 (Ala. Civ. App. 2008) (Moore, J., dissenting):

"[W]hen a parent petitions the juvenile court to regain custody of the child, the juvenile court is confronted with several separate, but interrelated, questions: (1) whether the child remains dependent, see J.P. v. S.S., 989 So. 2d 591 (Ala. Civ. App. 2008), (2) whether reasonable efforts at reunification, if required, have failed or succeeded, see Ala. Code 1975, § 12-

19

15-65(f), and (3) whether it is in the best interests of the child to be returned to the custody of the parents. See Ala. Code 1975, § 12-15-71(a)."

As is the case when the Department of Human Resources seeks a change in a child's disposition, when a juvenile court is considering a motion filed by a parent seeking a return of a child to the parent's custody, the Department of Human Resources must establish first that the child remains dependent. See D.D.P. v. D.M.B., 173 So. 3d 1, 3 (Ala. Civ. App. 2015); see also J.B., 992 So. 2d at 50 (Moore, J., dissenting) ("[W]hen the state has deprived a parent of custody of a child on the basis of the child's dependency, the burden rests on the state to prove by clear and convincing evidence that the child remains dependent. Having proven that circumstances existed at one time that rendered the child dependent, the state is not relieved of its burden of proving that the child remains dependent at a later time or under different circumstances."). To establish continuing dependency, the Department of Human Resources should present evidence regarding that status. When the continuing dependency is based on the same or similar circumstances that caused the original dependency, such evidence may include

20

indicating that reasonable efforts have been made to rehabilitate the parent and to correct the conduct or condition that resulted in the child's original dependency, unless the Department of Human Resources has been relieved of making such efforts, and that those efforts have either failed or have not been successful enough to permit reunification. J.B., 992 So. 2d at 50 (Moore, J., dissenting) ("[I]n order for a juvenile court to deprive parents of the custody of a dependent child, the burden would be on [the Department of Human Resources], as the representative state agency, to prove by clear and convincing evidence that reasonable efforts at reunification, if required, have failed or, in an ongoing dependency case, at the very least, that such efforts had not yet succeeded."). If the Department of Human Resources cannot establish the continuing dependency of the child by clear and convincing evidence, the juvenile court lacks jurisdiction to enter a judgment awarding custody of the child to anyone but the parent and is required by statute to dismiss the dependency action. See Ala. Code 1975, § 12-15-310(b) ("If the juvenile court finds that the allegations in the petition have not been proven by clear and convincing evidence, the juvenile court shall dismiss the

21

petition."); H.C. v. S.L., 251 So. 3d 793, 794 (Ala. Civ. App. 2017) ("If the child is not dependent at the time of the dispositional judgment, the juvenile court lacks jurisdiction to make a custody determination.").

The juvenile court's factual findings in a dependency case when the evidence has been presented ore tenus are presumed correct. T.D.P. v. D.D.P., 950 So. 2d 311 (Ala. Civ. App. 2006). A finding of dependency must be supported by clear and convincing evidence. Ala. Code 1975, § 12-15-310(b). When a juvenile court has not made specific factual findings in support of its judgment, we must presume that the juvenile court made those findings necessary to support its judgment, provided that those findings are supported by the evidence. K.C. v. Jefferson Cnty. Dep't of Hum. Res., 54 So. 3d 407, 413 (Ala. Civ. App. 2010). In addition, the juvenile court may consider the totality of the circumstances when making a finding in a dependency proceeding. G.C. v. G.D., 712 So. 2d 1091, 1094 (Ala. Civ. App. 1997); see also T.D. v. S.R., 293 So. 3d 434, 436 (Ala. Civ. App. 2019); R.G. v. Calhoun Cnty. Dep't of Hum. Res., 716 So. 2d 219, 222 (Ala. Civ. App. 1998); and D.P. v. State Dep't of Hum. Res., 571 So. 2d 1140 (Ala. Civ. App. 1990).

The term "dependent child" is defined in Ala. Code 1975, § 12-15-102(a)(8), as follows:

"(8) DEPENDENT CHILD. a. A child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:

"1. Whose parent, legal guardian, legal custodian, or other custodian subjects the child or any other child in the household to abuse, as defined in [Ala. Code 1975, §] 12-15-301 or neglect as defined in [§] 12-15-301, or allows the child to be so subjected.

"2. Who is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.

"3. Whose parent, legal guardian, legal custodian, or other custodian neglects or refuses, when able to do so or when the service is offered without charge, to provide or allow medical, surgical, or other care necessary for the health or well-being of the child.

"4. Whose parent, legal guardian, legal custodian, or other custodian fails, refuses, or neglects to send the child to school in accordance with the terms of the compulsory school attendance laws of this state.

"5. Whose parent, legal guardian, legal custodian, or other custodian has abandoned the child, as defined in [§] 12-15-301[(1)].

23

"6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.

"7. Who has been placed for care or adoption in violation of the law.

"8. Who, for any other cause, is in need of the care and protection of the state."

Section 12-15-301(1) defines the term "abandonment" as:

"A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."

The evidence relating to the daughters does not rise to the level necessary to support a conclusion that they continue to be dependent. Marinos testified that he had not requested that the father participate in further services upon the father's completion of those services that DHR had previously offered. Although Marinos testified that he could not say that the father had benefited from the services that he had completed, he also failed to testify that the father had <u>not</u> benefited from those services. The evidence indicated that the father has both gainful employment and

24

a safe and clean residence. Although some evidence casts doubt on their testimony, both the father and A.M. testified that they were no longer involved in a romantic relationship; notably, no evidence indicated that DHR had informed either the father or A.M. that they would be required to separate in order to be reunified with the children. A.M. testified that the father had changed for the better after completing the services offered by DHR. Although the record contains some evidence indicating that the father had been confrontational toward the intervenors and maternal aunt, Marinos specifically testified that he had not learned of any incidents of domestic violence or anger during his tenure as caseworker. The evidence concerning A.B.C.'s brief period of living with either A.M. or A.M. and the father after her residence was consumed in a fire was, in our opinion, irrelevant.

With respect to the father's relationship with the daughters, the maternal aunt testified that the father had visited the daughters regularly, that they and the father had interacted well during those visits, and that she had no concerns about the father's ability to care for the daughters other than concerns about his past behavior with A.B.C.

25

Although the maternal aunt testified that the father had been abusive to A.B.C. in front of the daughters in the past, she did not indicate when the father and A.B.C. had last resided together. The maternal aunt indicated both that the father had been confrontational with her and that she had had little interaction with him; she did not testify, as did the intervenors, that the father had harassed her or that he had been unpleasant to her, other than to say that he had spoken to her at work a few times and that she had not engaged with him. While the father's tendency to confront his children's caregivers is not an admirable trait, his interactions with the maternal aunt do not appear to have caused her undue upset or impacted her ability to supervise his visitation with the daughters such that those interactions could be considered serious enough upon which to rest a finding of dependency. Our review of the record convinces us that the juvenile court lacked clear and convincing evidence indicating that the conduct or condition of the father at the time of the trial was such that the daughters remained dependent. The juvenile court's judgments regarding the daughters in case numbers JU-20-542.01 and JU-20-

26

543.01 are therefore reversed, and the causes are remanded for the entry of judgments consistent with this opinion.

Regarding the son, however, the record discloses that the father, although he may have seen the son on a few occasions in June or July 2021, had failed to establish regular visits or otherwise communicate with the son for over a year before requesting specific visitation from DHR in the period between the November 2021 trial date and the December 2021 trial date. The father had not participated in the son's care, had not attended any physician or physical-therapy appointments with the son, and had not, as far as the record reveals, communicated with the intervenors about the welfare of the son after he was placed in their home. Thus, the evidence indicates that, after the child's removal from the custody of the father, "the child [was deprived of] the presence, care, protection, or filial affection of the father," § 12-15-301(1), and "that the [father] [failed to] claim[] the rights or perform[] the duties of a parent," id., suggesting that the father's conduct could be considered abandonment of the son. See A.E. v. M.C., 100 So. 3d 587, 598 (Ala. Civ. App. 2012) (explaining that "failing to be present and act as a parent is

[an] equally significant" consideration when a juvenile court is considering whether a parent's conduct amounts to abandonment).

At the postjudgment hearing, the juvenile court addressed its reasons for its judgment, which included its conclusion that the father lacked credibility based on its concerns that the father had committed perjury during either the hearing on the PFA petition or during the trial before the juvenile court. In addition, the juvenile court explained on the record:

"What did bother me was his attitude outside of this courtroom as everyone, including himself, testified to that he basically didn't go see [the son] because he didn't like what DHR had set up. And, again, I'm paraphrasing. But that was the intent. Not providing any support for his children bothers me tremendously. I will say this I think [the issue regarding the son] is clear-cut. … He didn't participate. He's admitted he didn't participate. He has no idea how to handle the special needs of that child. He didn't care to find out is basically what he testified to because he didn't like the situation."

In its postjudgment order, the juvenile court specifically found that, "[w]hether by choice or inability, the father was and is incapable of providing care for a child with special needs of this type."

Although the juvenile court did not specifically make a finding of abandonment, based on the evidence, the juvenile court could have been

28

clearly convinced that the father's conduct amounted to abandonment of the son and could therefore have concluded that the son remained dependent based on Ala. Code 1975, § 12-15-102(8)5., and § 12-15-301(1). In addition, in light of the juvenile court's comments on the record at the postjudgment hearing and its statement in the postjudgment order, the juvenile court was clearly convinced that the father was either "unable or unwilling to discharge his … responsibilities to and for the [son]," see § 12-15-102(8)6., as evidenced by the father's failure to participate in regular visitation and his failure to learn about the special needs of the son through attendance at medical appointments, and that therefore the child was dependent under § 12-15-102(8)6. Furthermore, at the postjudgment hearing, the juvenile court spoke of the father's disinterest in participating in reunification efforts because of his dislike of "the situation," and we have explained that a parent's failure to participate in services and reunification plans to ameliorate the conditions that gave rise to the child's initial or continuing dependency may be considered evidence of continuing dependency. See R.R. v. Chilton Cnty. Dep't of Hum. Res., [Ms. 2200709, Jan. 7, 2022] ___ So. 3d ___, ___ (Ala. Civ. App.

29

2022) (indicating that a parent should "participate in the services offered [the Department of Human Resources] in an attempt to ameliorate the conduct or condition that led to [the Department of Human Resources's] involvement with the family," finding fault with the father, who had not cooperated with DHR or participated in services, and affirming the finding of dependency based, in part, on the father's lack of cooperation in reunification efforts). Because we may presume that the juvenile court made those findings that are necessary to support its judgment, provided such findings are supported by clear and convincing evidence contained in the record, see K.C., 54 So. 3d at 413, and because a juvenile court may consider the totality of the circumstances when making a finding of dependency, see G.C., 712 So. 2d at 1094, we conclude that the dependency finding contained in the judgment entered in JU-20-546.01 regarding the son is amply supported by the evidence.

The father specifically challenges the juvenile court's determinations that DHR made reasonable efforts to rehabilitate him, that those efforts had failed, and that "the problems requiring removal [of the children from the custody of the father] continued to exist." We

need not address this issue regarding the daughters because of the lack of evidence of their continuing dependency. Regarding the son, the father contends that DHR did not make reasonable efforts to rehabilitate him and that those efforts that DHR did make did not fail. To support his argument, the father points to evidence indicating that he had benefited from the services DHR had provided and Marinos's testimony indicating that he had not recommend any further services be provided to the father.

> "'Reasonable efforts' include 'efforts ... to make it possible for a child to return safely to the child's home,' [former] Ala. Code 1975, § 12-15-65(m) [now codified at Ala. Code 1975, § 12-15-301(13)], such as efforts to rehabilitate the parent so that the parent can 'again exercise familial rights and responsibilities toward the child in question.' Miller v. Alabama Dep't of Pensions & Sec., 374 So. 2d 1370, 1374 (Ala. Civ. App. 1979); see also D.M.P. v. State Dep't of Human Res., 871 So. 2d 77, 89 n.10 (Ala. Civ. App. 2003) (plurality opinion). Whether efforts at reunification have been reasonable and whether those efforts have failed or succeeded are questions of fact for the juvenile court to determine. T.B. v. Cullman County Dep't of Human Res., 6 So. 3d 1195, 1199 (Ala. Civ. App. 2008).

> > "'In making that determination, the juvenile court must first identify the parental conduct, circumstances, or condition that led to the removal of the children and prevented their return to the custody of the parent.... The juvenile court must then consider the efforts expended by the parent in overcoming those problems and the progress the

> parent has made in eliminating or reducing those problems, so that they no longer constitute a barrier to reunification.'

"T.B., 6 So. 3d at 1199."

R.T.B. v. Calhoun Cnty. Dep't of Hum. Res., 19 So. 3d 198, 204 (Ala. Civ. App. 2009).

Contrary to the father's assertions in his brief, however, the juvenile court was not required to return the son to his custody merely because the father completed the services offered to him. We have explained that, "[i]n assessing the success of reasonable efforts at reunification, the juvenile court is not limited to determining solely whether the parent has complied with the reunification plan or conditions established by [the Department of Human Resources]." R.T.B., 19 So. 3d at 205. Although some of the evidence adduced at trial might have supported the conclusion that the father's participation in services had alleviated the conduct or conditions that served as a barrier to reunification, the father's failure to visit with, maintain contact with, or even check on the welfare of the son could have been considered by the juvenile court as evidencing that the father had intentionally withheld

from the son "his … presence, care, love, protection, maintenance, or the opportunity for the display of filial affection" and had failed "to claim the rights … or … to perform the duties of a parent." § 12-15-301(1). Although the juvenile court was considering only the dependency of the son, Ala. Code 1975, § 12-15-319(a)(1), is instructive here. That Code section provides that "reasonable efforts to … reunite the child with the parent[]" are not required when that parents has been found to have abandoned his or her child. Because, as we have already determined, the juvenile court could have concluded that the father had abandoned the son, we are not convinced that the father's completion of services and Marinos's testimony that additional services were not required necessitates the conclusions that the father and the son should be reunified and that the dependency judgment entered in case number JU-20-546.01 regarding the son should be reversed.

Because we have determined that clear and convincing evidence supports the juvenile court's dependency finding in the judgment entered in case number JU-20-546.01 regarding the son, and because we are not convinced that the father is entitled to reunification merely because he

33

2210396, 2210397, and 2210398

had completed services offered by DHR, we affirm that judgment. However, the record lacks sufficient evidence to support the findings of dependency in the judgments entered in case numbers JU-20-542.01 and JU-20-543.01 regarding the daughters. Accordingly, we reverse the juvenile court's dependency judgments entered in case numbers JU-20-542.01 and JU-20-543.01, and we remand those causes for proceedings consistent with this opinion.

2210396 -- REVERSED AND REMANDED.

2210397 -- REVERSED AND REMANDED.

2210398 -- AFFIRMED.

Moore, Hanson, and Fridy, JJ., concur.

Thompson, P.J., concurs in the result, without opinion.